**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **KEISHA POWELL,** | § | |
| **Plaintiff,** | § | |
| **v.** | § | **Civil Action No. 3:21-CV-02226-G-BH** |
| | § | |
| **KILOLO KIJAKAZI,** | § | |
| **ACTING COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | **Referred to U.S. Magistrate Judge**[1] |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Based on the relevant filings, evidence, and applicable law, the final decision of the Commissioner of Social Security (Commissioner) denying the plaintiff's claims for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (the Act) should be **AFFIRMED**.

## I.    BACKGROUND

Keisha Demetria Powell (Plaintiff) filed her application for DIB on September 3, 2019, alleging disability beginning December 6, 2018. (doc. 11-1 at 301, 363-64, 374-75, 452.)[2] Her claims were denied initially on January 24, 2020, and upon reconsideration on June 9, 2020. (*Id.* at 391, 400.) After requesting a hearing before an Administrative Law Judge (ALJ) on June 23, 2020, she appeared at a telephonic hearing on October 5, 2020. (*Id.* at 44, 323-62.) On December 21, 2020, the ALJ found that Plaintiff had not been disabled from her alleged onset date of December 6, 2018, through the date of her decision. (*Id.* at 315-16.)

---

[1]By *Special Order 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.

[2]Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

Plaintiff timely appealed the ALJ's decision to the Appeals Council on December 21, 2020, and she submitted additional evidence on April 5, 2021, and May 7, 2021. (*Id.* at 5-7, 11-17, 24-25). The Appeals Council denied her request for review on August 12, 2021, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 5-7.) She timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

## A.  Age, Education, and Work Experience

Plaintiff was born on June 11, 1974; she was 46 at the time of the hearing. (doc. 11-1 at 323, 452.) She had at least a high school education and could communicate in English. (*Id.* at 488-89.) She had past relevant work as a computer security specialist and computer engineer. (*Id.* at 314, 359.)

## B.  Medical Evidence

Plaintiff sustained multiple injuries during her 23 years in the military. (*Id.* at 2155.) In 1998, she fell overboard, injuring her neck, spine, and right knee. (*Id.* at 1476, 1491, 1514, 1546, 1559, 1574.) Motor vehicle accidents in 2014 and 2019 exacerbated her symptoms. (*Id.*) The Department of Veterans Affairs (VA) assigned her a 100 percent service-connected disability rating (VA rating) on September 1, 2016. (*Id.* at 463-64.)

From between June 2015 and September 2020, Plaintiff received medical treatment primarily through the VA for multiple physical impairments, including degenerative disc disease of the lumbar spine, degenerative disc disease of the cervical spine status post-surgery, osteoarthritis of the bilateral knees, fibromyalgia, migraines, obstructive sleep apnea (OSA), obesity, hearing loss, hypertension, hypothyroidism, anal fissure, uterovaginal prolapse status post hysterectomy, and overactive bladder. (*Id.* at 667-1928, 1937-1949, 1974-2158.)

On June 7, 2019, Plaintiff presented to the Mental Health Trauma Services Clinic at the

VA for a psychotherapy interview with Sarah A. Sadler, Ph.D. (*Id.* at 1844-49.) She reported intrusive trauma memories, anxiety, low mood, self-isolation, not trusting others, and panic attacks; her symptoms had worsened over time. (*Id.* at 1845-46.) She described "particularly bad" irritability, anger, and family conflict. (*Id.* at 1846.) She reported a history of sexual and emotional abuse in her childhood and the military and violence towards others. (*Id.* at 1846-48.) She had been fired upon during her time in the military but denied having post-military trauma. (*Id.*) She had limited contact with others; she spent time with her dogs, going to the movies, and working in her yard or garden. (*Id.*) Her mental status examination revealed she was cooperative, had euthymic mood and affect, normal eye contact and speech, intact insight and judgment; her thoughts were logical, goal-directed, and rational. (*Id.* at 1848.) Dr. Sadler diagnosed her with PTSD and major depressive disorder (MDD). (*Id.* at 1849.)

On June 21, 2019, Plaintiff presented to the VA for a medication refill. (*Id.* at 1837-40.) She had previously been prescribed Prazosin for nightmares, Ambien for sleep, and Modafinil for narcolepsy or OSA at Walter Reed National Military Medical Center (Walter Reed), but she had been out of medication for "awhile." (*Id.* at 1838.) She reported daytime fatigue and headaches. (*Id.*) A psychiatric specialty examination revealed she was cooperative, her mood was "okay," and she had linear and goal-directed thought process, intact associations, fair insight and judgment, normal speech rate, tone, and volume, and mildly restricted affect. (*Id.* at 1839.) She was assessed with PTSD with "increased symptoms" when off medications; she was prescribed Bupropion, as it had improved her anxiety and depression and reduced her headaches in the past. (*Id.*)

On July 2, 2019, Plaintiff presented to the VA to establish care with a medical provider. (*Id.* at 1814-19.) She reported feeling irritable, moody, groggy, and frustrated "with everything," having nightmares, and worsened mood due to overspending. (*Id.* at 1814.) She was positive for

fatigue, fibromyalgia, arthritis, migraines, and chronic pain at 9/10. (*Id.* at 1817-18.) Her mental status examination showed she was calm and cooperative but also irritable and reactive, with fair insight and judgment, logical and organized thought process, and grossly intact memory to recent and remote events. (*Id.* at 1818.) She was diagnosed with PTSD, her medications were continued, and she was instructed to titrate Wellbutrin to her prior dose of 300 milligrams daily. (*Id.* at 1819.)

On November 13, 2019, Plaintiff presented to the VA for a follow-up. (*Id.* at 1704-07.) She complained of harassment and retaliation at her new job, poor sleep, and feeling "not good" and "very angry" over her work experience. (*Id.*) She had been on a leave of absence since September. (*Id.* at 1704.) A mental status examination revealed she was calm and cooperative, with normal speech rate and tone, logical thought process, and fair insight and judgment, but angry mood. (*Id.* at 1707.) She was assessed with PTSD and insomnia. (*Id.*)

On December 19, 2019, Plaintiff presented to Dr. Sadler for a follow-up and treatment plan. (*Id.* at 1692-94.) She reported having significant anger and homicidal ideation toward authority and that she had taken a leave of absence from work due to anger and "building" resentment. (*Id.* at 1693.) Dr. Sadler opined that she appeared to be "controlled" by her anger. (*Id.*) Plaintiff agreed to attempt anger management therapy. (*Id.*)

On January 6, 2020, Plaintiff presented to the VA for an anger management group therapy session. (*Id.* at 1690-91.) The clinical social worker noted that Plaintiff "fully participated" in the group discussion, engaged "with ease" with other group members, and contributed to meaningful discussion. (*Id.* at 1691.) He also noted that she was in a good mood, had appropriate affect, and normal speech rate, tone, and volume, with no evidence of hallucinations or homicidal/suicidal ideation. (*Id.*)

On January 28, 2020, Plaintiff returned to Dr. Sadler at the VA for a follow-up visit. (*Id.*

at 1665-69.) She reported attending church more regularly and taking walks with her husband, which had been "helpful distraction" techniques. (*Id.* at 1665.) She described having a "so-so" mood; Zoloft had been helpful for agitation and feeling "a little more upbeat." (*Id.*) She reported poor sleep, some irritability, anxiety when feeling overwhelmed, and a 15-pound weight gain, which was "not tolerable." (*Id.* at 1665-66.) She was calm and cooperative and had a restricted affect, logical thought process, and fair insight and judgment. (*Id.* at 1667-68.) She was assessed with PTSD and insomnia. (*Id.* at 1668.) Her prescriptions were updated to include Lexapro and to discontinue Zoloft. (*Id.*)

On March 12, 2020, Plaintiff presented for an in-person individual therapy session. (*Id.* at 1646-47.) She was cooperative and had a euthymic mood, linear and goal-directed thought process, fair insight and judgment, and normal speech rate, tone, and volume. (*Id.* at 1647.)

On June 8, 2020, state agency psychological consultant (SAPC) Matthew Wong, Ph.D., completed a psychiatric review technique based on Plaintiff's medical record. (*Id.* at 379-82.) He opined that she had mild limitations in her ability to understand, remember, or apply information, and moderate limitations in her ability to interact with others, concentrate, persist, or maintain pace, and adapt or manage herself. (*Id.* at 381.) He noted that Plaintiff helped care for her dogs, prepared her own meals, performed "very light" household chores, and was able to pay bills and handle a savings account. (*Id.*) He also noted that she "only alleged" memory fog in her initial application and had reported that her physical impairments caused the "biggest" issues with attending to activities of daily living. (*Id.*) He concluded that her alleged limitations due to conditions were not consistent with the evidence of record. (*Id.* at 382.)

SAPC Wong also completed a mental RFC assessment. (*Id.* at 385-87.) He opined that Plaintiff had no limitations with her ability to understand and remember information; she had

sustained concentration and persistence limitations, including moderate limitations in the ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerance, and in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (*Id*. at 385-86.) She also had social interaction limitations, including moderate limitations in accepting instructions and responding appropriately to criticism from supervisors, as well as adaptation limitations, including moderate limitations in responding appropriately to changes in the work setting. (*Id.* at 386.) He concluded that Plaintiff was able to understand, remember, and carry out detailed but not complex instructions, make decisions, concentrate for extended periods, interact with others, and respond to changes. (*Id.* at 387.)

In a phone call on July 30, 2020, Plaintiff visited with psychiatrist Carolyn J. Morrow, M.D., and reported that she was "doing OK." (*Id.* at 2033-36.) At her last visit in April 2020, her antidepressant was changed to Wellbutrin, and she was started on Gabapentin for anxiety. (*Id.* at 2033.) She reported "severe" neck pain and ongoing insomnia, which was largely related to her neck pain. (*Id.* at 2034.) She also reported that Wellbutrin had been "helpful" for mood and anxiety, her overall anxiety had decreased, and her energy and motivation had improved. (*Id.*) She had ongoing irritability, but she was better able to control it; she denied any hallucinations or homicidal/suicidal ideation. (*Id.*)

In a phone call on August 7, 2020, Plaintiff visited with Meara L. Weitzman, Ph.D., for individual therapy for PTSD and MDD. (*Id.* at 2023-25.) She reported complications relating to a recent hysterectomy, stress caused by her mother's illness, and trouble sleeping. (*Id.* at 2024.) She was cooperative, reported a "good" mood, and had normal speech, euthymic sound overall, goal-

directed thought process, and fair/good insight and judgment. (*Id.* at 2025.)

## C. **Hearing Testimony**

On October 5, 2020, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (*Id.* at 323-62.) Plaintiff was represented by an attorney. (*Id.*)

### *1. Plaintiff's Testimony*

Plaintiff testified that she was 46 years old and lived with her husband. (*Id.* at 327.) She was right-handed and weighed around 200 pounds. (*Id.*) She had a GED, a bachelor's degree in criminal justice, and a master's degree in information technology. (*Id.* at 331.)

In February 2019, Plaintiff sustained a work-related injury at Raytheon. (*Id.* at 328-30.) She told Human Resources (HR) about her work injury, but they "didn't want to do anything about it." (*Id.*) After she filed the paperwork for worker's compensation, HR placed her on a leave of absence to investigate "everything." (*Id.*) After completing the investigation in January 2020, HR fired her and paid out an amount that appeared to be unemployment benefits. (*Id.* at 329-30.) Plaintiff had worked full time at Raytheon from February 2018 until September 2019; she did not do any physical work after September 2019. (*Id.* at 330-31.)

At Raytheon, she worked as a computer analyst and a cyber engineer. (*Id.* at 331-32.) In those roles, she would act as the program manager for any computer system that went down; she would analyze or troubleshoot the system, which involved taking the system apart, breaking it down, ordering parts, and bringing the system back up. (*Id.* at 332.) If there was a new building, she would install the infrastructure by setting up, plugging in, and coding the mainframe or computer system to make it work. (*Id.* at 332-33.) Prior to Raytheon, she did computer intelligence work in the Navy for 11 years, until 2016, and then worked as a cyber or computer engineer at two jobs, from 2016 to February 2018. (*Id.* at 333.)

Around the time of the hearing, Plaintiff had been going to both Walter Reed in Washington, D.C., and the VA in Dallas, for medical treatment. (*Id.* at 334.) In November 2020, an outside provider through the VA in Dallas performed thoracic surgery. (*Id.*) Because of some "complications" after the surgery, the provider wanted to do another surgery in December 2020, but Walter Reed told her to wait for a second opinion from the VA. (*Id.* at 334-37.) Approximately once a quarter, Plaintiff would fly to Washington, D.C., for pain management at Walter Reed because she was not "comfortable" being treated by the outside provider in Dallas and had not been getting "any relief." (*Id.* at 338.) After treatment, she would stay overnight or fly back the same day. (*Id.*)

Plaintiff was still experiencing "severe" issues with both legs. (*Id.* at 338-39.) Two days earlier, she had gone to the ER for a swollen right leg that was full of fluid and needed to be put in a breakaway cast. (*Id.* at 339.) She was discharged the same day, placed on crutches, instructed to keep her right leg elevated, and advised to undergo an MRI. (*Id.* at 339-43.)

Prior to the ER visit, Plaintiff had been using a cane "pretty much all the time," except for when her husband was around to help. (*Id.* at 340.) The cane had been issued to her in 2016; she took the cane to work at Raytheon in 2018 and 2019, and she continued to use it after her neck surgery in November 2019. (*Id.* at 340-41.)

The radiofrequency ablation (RFA) in her lower back provided temporary pain relief for about two months, but her back problems would return and were "getting worse." (*Id.* at 341-42.) Walter Reed scheduled her for more ablations in January 2021. (*Id.* at 342.) Plaintiff had been seeing a private practice chiropractor for the last five months, but the VA had recently referred her to the chiropractor who previously treated her for six months in 2018. (*Id.* at 343.)

From between September 2019 and her recent ER visit, Plaintiff could walk about 15 steps

on her own before she needed to sit down and could sit for no more than 5 or 10 minutes at a time. (*Id.* at 343-45.) She could lift no more than 10 pounds before hurting. (*Id.* at 346.)

When traveling by plane, Plaintiff would call the airline ahead of time to request a wheelchair, and her seat would be in the front with the middle seat blocked off. (*Id.* at 344-45.) During the flight, she would either keep getting up to go to the bathroom or lie down because her legs felt "so uncomfortable." (*Id.*) She would try to sleep until she reached her destination to take her mind off things. (*Id.*)

Although Plaintiff's function report stated that she could independently handle her personal care, like bathing, showering, and dressing, her abilities had changed "significantly" about two or three months before the hearing. (*Id.* at 346.) Since her November 2019 surgery, she needed help getting in and out of the shower or bathtub because the provider "messed around" with her neck and thigh, causing a lot of swelling. (*Id.* at 347.) She could still let her four little dogs out to the backyard but was unable to walk them because she could not handle them pulling her. (*Id.* at 348.) When she used to walk them, she had to take medication and lie down due to pain. (*Id.* at 348-49.)

Besides interacting with her husband and providers, Plaintiff did not really interact with outside family members. (*Id.* at 349.) She had stopped going to church and the movies since March or April 2020. (*Id.* at 349-50.) She was still attending PTSD group therapy, which entailed doing a group activity over the phone, receiving a bulletin, and going over each person's activities. (*Id.* at 350-51.) Because Plaintiff did not like "being in a setting like that with people," the therapist called her on the phone to go over her activities and to fill out her sheet. (*Id.* at 351-52.)

Plaintiff had trouble remembering things. (*Id.* at 352.) She had a traumatic brain injury in the military and suffered from PTSD and brain fog. (*Id.*) Her memory issues were one of the reasons why she did not finish out her military career and left after 23 years of service. (*Id.*) At the

time, she would lose track of time and of what was going on, and it was hard to remember things if she did not write them down. (*Id.* at 353.) Plaintiff also had trouble completing simple tasks and needed a written to-do list. (*Id.*)

Plaintiff dealt with anxiety and depression on a daily basis; she either screamed inside herself or got into a fit of rage and lashed out at others. (*Id.* at 354.) Because no one understood her or her feelings, she would feel hopeless about everything "[a]ll the time." (*Id.*) If an episode occurred while at home, she would go to a dark room; if she was at work, she would sit in her car to "work [it] out" until it passed. (*Id.* at 354-55.)

Due to a "detachment" from a head injury, Plaintiff's vision was blurry and would go "in and out" all the time. (*Id.* at 355.) She visited an eye doctor every six months. (*Id.*)

Plaintiff constantly experienced "extreme" and "piercing" ringing in the ears, which was distracting when trying to focus. (*Id.* at 355-56.) The ringing would also develop into a migraine. (*Id.* at 355.) Her migraines occurred frequently, or about five times a month, and were "piercing, sharp, [and] crushing". (*Id.* at 354.) They made her mopey, and she was unable to deal with sounds or smells. (*Id.* at 355.)

Besides her recent difficulties with completing simple tasks, showering, bathing, and getting dressed, Plaintiff also could not lift her arms due to spine issues, and her husband had to drive her. (*Id.* at 356.) She took more than 20 medications that left her "dazed" or "out of it" at times, to where she felt like she could not function, and that caused "all kind[s] of stuff" in her body. (*Id.* at 357-58.) She was trying to get her providers to combine or reduce her medications. (*Id.*)

### 2. *VE's Testimony*

The VE considered a first hypothetical individual who had the same age, education, and

past work as Plaintiff and could perform work at a sedentary exertional level, as defined by the regulations, and who was limited to occasionally balance, stoop, crouch, kneel, crawl, and climb ramps and stairs but never climb ladders, ropes, or scaffolds, and could not work with bright or flickering lights that might be experienced in welding or cutting metal-type positions; understand, remember, and carry out simple tasks with short, simple instructions; make simple work-related decisions and judgments; maintain attention, concentration, and pace sufficiently to perform simple work tasks; tolerate occasional workplace changes; have frequent interaction with supervisors and occasional interaction with coworkers and the public; and interact with coworkers sufficiently to complete a 30-day training period. (*Id.* at 359-60.) She could perform other jobs in the national economy, including work as a table worker (DOT 739.687-182, sedentary, SVP-2), [3] with 125,000 jobs nationally; a patcher (DOT 723.687-010, sedentary, SVP-2), with 67,000 jobs nationally; and a semiconductor bonder (DOT 726.685-066, sedentary, SVP-2), with 158,000 jobs nationally. (*Id.* at 360.)

The VE considered a second hypothetical individual who had the same limitations as the first but who needed to use a cane on all different types of terrain and during all walking portions, as typically defined for sedentary work. (*Id.*) The hypothetical individual could perform the same jobs previously identified because they were sedentary and required the individual to be seated at all times and to perform tasks in a seated position; there was no problem using a cane to go to and from the workstation. (*Id.* at 360-61.)

The VE considered a third hypothetical individual who had the same limitations as the second individual but, due to pain and some psychologically based symptoms, would need "some extra time" to complete tasks with at least two additional unscheduled breaks of 15 minutes. (*Id.*

---

[3] DOT stands for Dictionary of Occupational Titles; SVP stands for Specific Vocation Preparation.

at 361.) The required break time would be "too excessive for any competitive employment." (*Id.*)

The VE confirmed that her testimony was consistent with the information in the DOT, except for break times, use of cane, interactions with others, and "differing light," which were not specifically addressed in the DOT or the Selected Characteristics of Occupations (SCO). (*Id.*) Her answers to those issues were instead based on her 20 years of experience placing people in jobs and working with employers. (*Id.*) Plaintiff's attorney did not have any questions for the VE. (*Id.* at 361-62.)

### D. ALJ's Findings

The ALJ issued an unfavorable decision on December 21, 2020. (*Id.* at 316.) At step one, she found that Plaintiff had met the insured status requirements through December 31, 2024, and she had not engaged in substantial gainful activity since September 1, 2019.[4] (*Id.* at 302, 304.) At step two, she found that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine, degenerative disc disease of the cervical spine status post-surgery, osteoarthritis of the bilateral knees, fibromyalgia, migraines, OSA with continuous positive airway pressure (CPAP) use, major depressive disorder, PTSD, and obesity. (*Id.* at 304.) Despite those impairments, at step three, she found that Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the Social Security regulations. (*Id.* at 305-07.)

Next, the ALJ determined that Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), with the following limitations:

> [Plaintiff] can occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds. She can occasionally balance, stoop, kneel, crouch, or crawl. She is

---

[4] The ALJ explained that Plaintiff was alleging disability since December 6, 2018, but the record evidence, including her earnings report and testimony, showed that she had "engaged in substantial gainful activity from at least February 1, 2018, to September 1, 2019 during the period at issue." (doc. 11-1 at 303-04.)

unable to work with bright or flickering lights that might be experienced in welding or cutting metals. Mentally, she can understand, remember, and carry out simple tasks with short, simple instructions. She can make simple work-related decisions or judg[]ments. She can maintain attention, concentration, and pace sufficiently to perform only simple work tasks. She can tolerate only occasional workplace changes. She can have frequent interaction with supervisors. She can have only occasional interaction with co-workers and the public, and even though it is occasional interaction with co-workers, [she] can still interact with co-workers sufficiently to complete a 30-day training period. She requires use of a cane for walking over all types of terrains and during all portions of walking.

(*Id.* at 308). At step four, the ALJ determined that Plaintiff was unable to perform her past work as a computer security specialist or a computer engineer. (*Id.* at 314.) At step five, she found that although Plaintiff was not capable of performing past relevant work, considering her age, education, work experience, and RFC, there were other jobs that existed in significant numbers in the national economy that she could perform. (*Id.*) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from her alleged onset date of December 6, 2018, through the date of her decision. (*Id.* at 315.)

## II.    STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible

evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

14

4.  If an individual is capable of performing the work [s]he has done in the past, a finding of "not disabled" must be made.

5.  If an individual's impairment precludes h[er] from performing h[er] past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.    ISSUES FOR REVIEW

Plaintiff raises two issues for review:

1.  The ALJ's RFC is not supported by substantial evidence because it fails to account for the limitations stemming from Plaintiff's mental impairments, and fails to include the moderate deficiencies in concentration, persistence, and pace which the ALJ, herself, found.

2.  The ALJ's denial at step five is not supported by substantial evidence.

(doc. 16 at 3.)

### A.  **RFC Determination**

Plaintiff argues that the ALJ's RFC assessment is not supported by substantial evidence.

15

(doc. 16 at 5.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1). The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988) (per curiam). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected. *Falco*, 27 F.3d at 163-64. A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564.

Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v.*

16

*Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson*, 864 F.2d at 343 (citations omitted).

### 1. *Interacting with Others*

Plaintiff contends that substantial evidence does not support the RFC finding that she could frequently interact with supervisors. (doc. 16 at 10.)

Here, the ALJ considered Plaintiff's mental impairments when determining her RFC and found that she could understand, remember, and carry out simple tasks with short, simple instructions; make simple work-related decisions or judgements; maintain attention, concentration, and pace sufficiently to perform only simple work tasks; tolerate only occasional workplace changes; and be limited to frequent interaction with supervisors and occasional interaction with co-workers and the public. (doc. 11-1 at 308.) The ALJ referenced and directly considered the medical records from the VA, the opinions of Plaintiff's treating physicians and SAPC Wong, and her testimony from the administrative hearing. (*Id.* at 311-13.)

The treatment notes indicated that Plaintiff had a history of physical and sexual trauma during childhood and in the military and had complained of anxiety, depression, irritability, anger, panic attacks, fatigue, difficulty concentrating, and trust issues with authority, including having homicidal thoughts toward her boss in December 2019. (*See id.* at 1647, 1665, 1667, 1692, 1705-07, 1814, 1818, 1839, 1845-46, 1848, 1852, 2025, 2034.) The ALJ noted that Plaintiff's mental status evaluations from 2019 showed "some irritable mood due to work issues," but she was

otherwise alert and oriented with no depression and euthymic mood, and she was "cooperative although angry, with logical thought processes and thought content within normal limits." (*Id.* at 311.) Plaintiff's mental status evaluations from 2020 showed some findings of "variable moods and anger issues," but they were "largely within normal limits, particularly with medication changes." (*Id.*) The ALJ noted that the records from PTSD group therapy also reflected a "normal mental status examination." (*Id.*) In July 2020, Plaintiff reported doing "pretty good" overall, with reduced anxiety, improved energy and motivation, and better control of her irritability, and that her medication had been helpful for her mood and anxiety. (*Id.*) Her remaining mental status examinations in 2020 were largely normal, noting that she had appropriate mood and affect, coherent thoughts, euthymic mood, oriented times four with linear and goal-directed thought processes, no hallucinations, and fair insight and judgment. (*Id.*) The ALJ further noted that Plaintiff was usually cooperative with medical providers and was able to interact with them and participate in her treatment. (*Id.*)

The ALJ also considered SAPC Wong's RFC assessment and his opinion that Plaintiff could understand, remember, and carry out detailed but not complex instructions, make decisions, concentrate for extended periods, interact with others, and respond to change. (*Id.* at 313.) She found his opinion "partially persuasive" because it was supported by the medical evidence he reviewed, but she noted that subsequent evidence and testimony reflecting continuing mental health treatment and variable moods supported a reduction to unskilled work with other limitations. (*Id.*)

The ALJ also referenced Plaintiff's 100 percent VA rating, but she noted that it was based on agency standards that differed from those of the SSA. (*Id.*)[5] She further considered Plaintiff's

_____

[5] A VA rating is not legally binding on the Commissioner, but the Fifth Circuit considers it "evidence ... that must be considered." *Garcia v. Berryhill*, 880 F.3d 700, 705 (5th Cir. 2018) (quoting *Chambliss v. Massanari*, 269

statements and testimony that she lived with family, took public transportation, flew to and from medical appointments in another state, and went to church and the movies, which "involve being around others and interacting with others." (*Id.* at 306, 311-12.)

The ALJ found that while there were "some abnormal mental findings," Plaintiff did not have significantly abnormal findings on a consistent basis. (*Id.* at 311.) She noted that Plaintiff did not receive significant treatment for her mental functioning and "usually has received just medication and some outpatient services, which provide further support that she is not greatly limited due to her mental conditions." (*Id.*) Although she reported increased symptoms and anger when around too many people, she was able to cooperate with her medical providers, take public transportation and flights, shop in stores, and go to the movies at times, which the ALJ considered in finding that Plaintiff "is limited to, but can have frequent interaction with supervisors and occasional interaction with co-workers and the public." (*Id.* at 312.)

Plaintiff argues that the ALJ failed to account for her difficulty interacting with supervisors, which was an issue "recounted repeatedly in the record." (doc. 16 at 10.) She contends that there is no "accurate and logical bridge" between the RFC and the evidence of her "persistent irritability, anger, distrust issues and thoughts of harm towards supervisors and coworkers." (*Id.*) Although the ALJ did not specifically point out Plaintiff's past issues with her supervisors and coworkers, she found that her mental status evaluations "showed some irritable mood due to work issues" and anger issues. (*See* doc. 11-1 at 311.) The Fifth Circuit has held that "[t]he ALJ does not need to comment on every piece of evidence, but only must build an accurate and logical bridge between

---

F.3d 520, 522 (5th Cir. 2001)). "[W]hile the ALJ must consider the supporting evidence underlying the rating, [s]he need not provide any analysis of the rating itself." *Owen v. Kijakazi*, No. 21-60545, 2022 WL 118427, at *2 (5th Cir. Jan. 11, 2022) (citing 20 C.F.R. § 404.1504).

the evidence and the final determination." *Price v. Astrue*, 401 F. App'x 985, 986 (5th Cir. 2010). The ALJ considered evidence of Plaintiff's anger issues from work and being around too many people, along with her cooperation with medical providers, use of public transportation, and outings to the store and movies, in finding that she should be limited to frequent interaction with supervisors. (doc. 11-1 at 312.) As the fact-finder, the ALJ had the sole responsibility for determining whether Plaintiff's allegations regarding her anger, irritability, and need to avoid people were consistent with her testimony about her activities of daily living and with other evidence in the record. *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991) (per curiam); *see also Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000) ("Conflicts in the evidence are for the [ALJ] ... to resolve."). Accordingly, substantial evidence supports the ALJ's RFC finding that limited Plaintiff to frequent interaction with supervisors despite her mental impairments.

### 2. Concentration, Persistence, and Pace

Plaintiff argues that although the ALJ found that Plaintiff had moderate deficiencies in concentration, persistence, and pace, she did not account for this functional limitation in her RFC. (doc. 16 at 11.)

When a claimant is found to have a mental impairment, the ALJ must determine its severity by evaluating "the degree of functional loss resulting from the impairment in four separate areas deemed essential for work." *Boyd v. Apfel*, 239 F.3d 698, 705 (5th Cir. 2001) (citing 20 C.F.R. § 404.1520a(b)(3)). These four functional areas, known as the "paragraph B criteria," are: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. 20 C.F.R. § 404.1520a(c)(3). This rating process is known as "the psychiatric review technique" or the "technique." *Owen v. Astrue*, No. 3:10-CV-1439-BH, 2011 WL 588048, at *14 (N.D. Tex. Feb. 9,

2011) (citing SSR 96–8P, 1996 WL 374184, at *4 (S.S.A. July 2, 1996)).

    The paragraph B limitations "are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." SSR 96-8p, 1996 WL 374184, at *3. The mental RFC assessment requires a more detailed analysis in which the ALJ itemizes the paragraph B limitations and expresses them in terms of work-related functions, including "the abilities to understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers, and work situations; and deal with changes in a routine work setting." *Id.* at *6. Although the ALJ must consider the claimant's "paragraph B" functional limitations when determining the mental RFC, she is not required to incorporate them into her RFC assessment "word-for-word." *Westover v. Astrue*, No. 4:11-CV-816-Y, 2012 WL 6553102, at *8 (N.D. Tex. Nov. 16, 2012).

    Here, at steps two and three, in considering the paragraph B criteria, the ALJ found that Plaintiff had a "moderate limitation" in the ability to concentrate, persist, or maintain pace. (doc. 11-1 at 307.) She next determined that Plaintiff had the mental RFC to "maintain attention, concentration, and pace sufficiently to perform only simple work tasks." (*Id.* at 308.) At step five, based on the testimony of the VE, the ALJ concluded that Plaintiff had the RFC to perform jobs that existed in significant numbers in the national economy. (*Id.* at 314-15.)

    In determining Plaintiff's mental RFC, the ALJ explained that the limitations identified in paragraph B were not an RFC assessment but were used to rate the severity of mental impairments at steps 2 and 3. (*Id.* at 308.) She also explained that her assessment "reflects the degree of limitation [she] has found in the 'paragraph B' mental function analysis." (*Id.*) The ALJ considered Plaintiff's mental status evaluations from 2019 and 2020, which revealed some irritable mood due to work issues and findings of variable moods and anger issues but were otherwise within normal

limits as she was alert, oriented, and cooperative with no depression and euthymic mood. (*Id.* at 311.) At a medical visit in July 2020, Plaintiff reported doing "pretty good," that her medication was helpful for her mood and anxiety, and that she had reduced anxiety, improved energy and motivation, and better control of her irritability. (*Id.*) The ALJ noted that the remaining mental status examinations in 2020 were largely normal, reflecting appropriate mood and affect, coherent thoughts, euthymic mood, and fair insight and judgment. (*Id.*) She also noted that the treatment records from the VA show that was able to understand and interact with medical providers and participate in her treatment. (*Id.*) She further considered testimony that Plaintiff traveled on a quarterly basis to and from medical appointments in Washington, D.C., and could handle her personal care, except for two or three months before the hearing. (*Id.*)

The ALJ found SAPC Wong's opinion that Plaintiff could understand, remember, and carry out detailed but not complex instructions, make decisions, and concentrate for extended periods "partially persuasive" because it was supported by the evidence he reviewed. (*Id.* at 313.) She noted that Plaintiff reported activities indicating relatively intact mental functioning, but when considering her variable moods and reports of anger issues, she was too distractable to perform detailed or complex tasks, which justified limiting her RFC to understanding, remembering, and carrying out simple tasks with short, simple instructions. (*Id.*) The ALJ explained that Plaintiff was not limited beyond short simple work tasks because although she alleged problems with concentrating and completing tasks, she was generally able to maintain attention and concentration during mental status exams, and there were no notations of consistent problems with paying attention or needing redirection. (*Id.*)

The ALJ's decision shows that she considered, and incorporated into her RFC assessment, Plaintiff's moderate limitation in maintaining concentration, persistence, or pace. Ultimately,

substantial evidence in the record supports the ALJ's RFC finding that Plaintiff's moderate limitation in maintaining concentration, persistence, or pace restricted her RFC only to the extent that she could maintain attention, concentration, and pace sufficiently to perform only simple work tasks. *See Mattie D. C. v. Berryhill*, No. 3:18-CV-281-D-BT, 2019 WL 1084185, at *5 (N.D. Tex. Feb. 13, 2019), *adopted by* 2019 WL 1077372 (N.D. Tex. Mar. 7, 2019) (finding that the ALJ adequately considered plaintiff's moderate limitations in her mental functional abilities when making the RFC determination); *Smith v. Colvin*, No. 3:13-CV-1884-N-BN, 2014 WL 1407437, at *4-5, *adopted by*, 2014 WL 1407440 (N.D. Tex. Apr. 11, 2014) (recognizing that "courts in this circuit have held that an RFC limited to 'simple work' reasonably incorporates a moderate or even marked limitation in concentration, persistence, or pace") (citing cases); *Westover*, 2012 WL 6553102, at *9 (holding that substantial evidence supported the ALJ's RFC assessment that limited the claimant "to only performing work that involved detailed instructions," despite his moderate limitation in maintaining concentration, persistence, or pace, where the ALJ made that determination "based upon [his] evaluation of the evidence"); *see also Cornejo v. Colvin*, No. EP-11-CV-470-RFC, 2013 WL 2539710, at *9 (W.D. Tex. June 7, 2013) ("[T]he limitations on which the RFC is based are not required to be included verbatim in the RFC or in a hypothetical to the vocational expert.").

Because the ALJ relied on medical evidence in the record in making her RFC determination, her assessment regarding Plaintiff's mental limitations was supported by substantial evidence. To the extent that Plaintiff argues that the evidence warrants greater limitations than those found by the ALJ, a reviewing court applying the substantial evidence standard does not reweigh the evidence, retry the issues, or substitute its own judgment. *See Greenspan*, 38 F.3d at 236. Remand is not required on this issue.

B. **Conflict with DOT**

Plaintiff argues that the ALJ's denial at step five is not supported by substantial evidence because she relied on erroneous VE testimony that conflicted with the DOT. (doc. 16 at 12.)

To be considered disabled, a claimant must have a severe impairment that makes her unable to perform her previous work or any other substantial gainful activity existing in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1505(a). According to the Code of Federal Regulations, "[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements [that a claimant is] able to meet with h[er] physical or mental abilities and vocational qualifications." 20 C.F.R. § 404.1566(b). It is the Commissioner's burden at step five to show that a claimant is capable of performing other gainful employment in the national economy. *See* 20 C.F.R. § 404.1520(a)(4)(i); *Greenspan*, 38 F.3d at 236. Once the Commissioner finds that jobs in the national economy are available to a claimant, the burden of proof shifts back to the claimant to rebut this finding. *See Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing *Fraga*, 810 F.2d at 1302).

The Commissioner may consult several different sources of evidence, including VEs and the DOT,[6] to determine when presumptively-disabled claimants can perform alternative and available work. *See Veal v. Soc. Sec. Admin.*, 618 F. Supp.2d 600, 608 (E.D. Tex. May 21, 2009). VEs assess whether jobs exist for a person with the claimant's precise abilities and help to determine complex issues, such as whether a claimant's work skills can be used in other work, and the specific occupations in which they can be used. *See* 20 C.F.R. §§ 404.1566(e), 416.966(e). The

---

[6]The DOT and SCO comprise a comprehensive listing of job titles in the United States, along with detailed descriptions of requirements for each job, including assessments of exertional levels and reasoning abilities necessary for satisfactory performance of those jobs. The Commissioner recognizes the DOT/SCO publications as authoritative, and routinely relies on them "for information about the requirements of work in the national economy." *See* SSR 00–4p, 2000 WL 1898704, at *2.

ALJ may rely on the testimony of a VE in response to a hypothetical question[7] or other similar evidence. *Newton*, 209 F.3d at 458; *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). SSR 00-4p[8] requires that prior to relying upon evidence from a VE to support a determination of disability, the ALJ must identify and obtain a reasonable explanation for any apparent conflicts between occupational evidence provided by a VE and information in the DOT. *See* 2000 WL 1898704, at *1-2. As part of her duty to fully develop the record, the ALJ has an "affirmative responsibility" to inquire of the VE on the record whether there is such an inconsistency. *Id.* at 4; *see Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016) (citations omitted).

A direct conflict may arise when the VE's testimony regarding the exertional or skill level of a particular job is facially different than that indicated in the DOT, or when the VE's testimony creates a conflict between the ALJ's RFC determination and the description of the jobs in the DOT. *See Carey v. Apfel*, 230 F.3d 131, 147 (5th Cir. 2000). Conversely, implied conflicts and exceptions occur under various unique circumstances when VEs are called to testify as to an individual claimant's capabilities. *See id.* at 146-47. Because the DOT cannot satisfactorily address every such situation, claimants are not permitted to scan the record for implied or unexplained conflicts and then present the conflict as reversible error. *See id.* Unless a direct and obvious conflict exists

---

[7] "The ALJ relies on VE testimony in response to a hypothetical question because the VE 'is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Benton ex rel. Benton v. Astrue*, 3:12-CV-874-D, 2012 WL 5451819, at *7 (N.D. Tex. Nov. 8, 2012) (quoting *Carey*, 230 F.3d at 145). A hypothetical question posed to a VE must reasonably incorporate all the claimant's disabilities recognized by the ALJ, and the claimant must be afforded a fair opportunity to correct any deficiencies in the hypothetical question. *Bowling*, 36 F.3d at 436.

[8] Because conflict between VE testimony and the DOT occurred with some frequency, the Commissioner issued SSR 00-4p to ensure that ALJs would expose and reconcile such conflict before relying on VE testimony. *See* SSR 00-4p, 2000 WL 1898704. SSRs represent "statements of policy and interpretations" adopted by the SSA that are "binding on all components" of the SSA. *See* 20 C.F.R. § 402.35(b)(1). While binding on the Administration, these interpretive rulings are not binding on the courts and need not be given the force and effect of law. *Batterton v. Francis*, 432 U.S. 416, 425 n.9 (1977) (noting the varying degrees of deference the rulings may be afforded). Courts may "rel[y] upon the rulings in evaluating ALJs' decisions," however. *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001) (per curiam).

between the VE's testimony and the DOT, the ALJ met her step five burden. *See* SSR 00–4p, 2000 WL 1898704 at *4; *Carey*, 230 F.3d at 146 (when a "direct and obvious conflict" exists between the VE's testimony and the DOT, the ALJ must resolve that conflict by determining whether the VE's explanation is reasonable and thus more reliable than the DOT); *Nichols v. Comm'r of Soc. Sec. Admin.*, No. 10-CV-0651, 2011 WL 2669056 at *6 (N.D. Tex. 2011), *adopted by* 2011 WL 2669099 (N.D. Tex. July 6, 2011) (when indirect conflict did not undergo adversarial development at the administrative hearing, the VE "testimony may be relied upon without resolving the conflict as long as the record reflects an adequate basis for doing so").

At the hearing, the ALJ described a hypothetical individual of Plaintiff's age, education, and past work experience with the same RFC. (doc. 11-1 at 359-60.) The VE testified that there were three sedentary jobs with an SVP rating of 2 that existed in significant numbers in the national economy that the hypothetical individual could perform: table worker, patcher, and semiconductor bonder. (*Id.* at 360-61.) The VE acknowledged that her testimony was consistent with the DOT, except for break times, using a cane, interactions with others, and "differing light," which were not specifically addressed in the DOT or SCO and therefore based on her 20 years of vocational expertise and experience. (*Id.* at 361.)   The ALJ relied exclusively on the VE's testimony to determine that an individual with Plaintiff's RFC could perform other work as a table worker, patcher, and semiconductor bonder. (*Id.* at 315.)

The ALJ complied with her duty under SSR 00–4p by asking the VE, on the record, whether her testimony conformed to the DOT. (*Id.* at 361.) The VE responded in the affirmative, and Plaintiff's counsel failed to present any conflicts through cross-examination. (*Id.* at 361-62.) Nothing at the hearing appears to have triggered any reason for the ALJ to elicit a "reasonable explanation" for any possible conflicts. *See Johnson v. Comm'r of Soc. Sec. Admin.*, No. 3:11-CV-

3126-L, 2013 WL 632104, at *13 (N.D. Tex. Feb. 4, 2013), *adopted by* 2013 WL 628561 (N.D. Tex. Feb. 20, 2013) (citing *Gaspard v. Soc. Sec. Admin., Comm'r*, 609 F. Supp.2d 607, 613-14 (E.D. Tex. 2009)); *Graves*, 837 F.3d at 593 (noting that there is no violation of SSR 00-4p if the plaintiff fails to show the VE's "testimony was actually inconsistent with the DOT").

### 1. *Reasoning Level*

Plaintiff argues that there was a conflict between the VE's testimony and the DOT because the jobs of patcher and semiconductor bonder require a reasoning level[9] of 2, which requires the ability to "apply commonsense understanding to carry out detailed but uninvolved written or oral instructions," and exceeds the ALJ's RFC limitation to short and simple instructions. (doc. 16 at 13.)

Courts in the Fifth Circuit, "as well as appellate and district courts outside the Fifth Circuit, have already determined that there is no direct or apparent conflict between an RFC limiting a plaintiff to 'simple' instructions [or tasks] and a VE's testimony that a plaintiff may perform work at a reasoning level of two." *Smith v. Colvin*, No. 3:13-CV-1884-N, 2014 WL 1407437 (N.D. Tex. Mar. 24, 2014), *adopted by* 2014 WL 1407440, at *6 (N.D. Tex. Apr. 11, 2014). Rather, "[a] reasoning level of two has repeatedly been found to be consistent with the reasoning ability to understanding simple instructions and perform simple tasks." *Castillo v. Colvin*, No. H-12-3512, 2014 WL 897798, at *14 (S.D. Tex. Mar. 6, 2014) (collecting cases). This persuasive authority supports a determination that Plaintiff's limitation to "understand, remember, and carry out simple tasks with short, simple instructions" could support her ability to work in jobs with a reasoning

---

[9]Each job title within the DOT has a corresponding reasoning development level that identifies the "reasoning capabilities" required for performing that job. *Hardin v. Astrue*, No. 3:10-CV-1343-B-BH, 2011 WL 1630902, at *8 n.5 (N.D. Tex. Mar. 31, 2011), *adopted by* 2011 WL 1633132 (N.D. Tex. Apr. 29, 2011) (citing *Otte v. Comm'r of Soc. Sec.*, 2010 WL 4363400, at *7 (N.D. Tex. Oct. 18, 2010)). An RDL "should not be ignored or disregarded." *Id.* (citing *Gaspard*, 609 F. Supp.2d at 617).

level of two. *See id.* (finding that "jobs with a DOT reasoning ability of two are not inherently inconsistent with [the] ability to understand simple instructions and perform simple tasks").[10] Because jobs performed at a reasoning level of two are not inconsistent with Plaintiff's RFC, there is no conflict between the VE's testimony and the DOT.

### 2. Lighting Restrictions

Plaintiff also contends that the table worker job "has a readily apparent conflict with the RFC limitation to no work around bright or flickering lights." (doc. 16 at 16-17.)

In the DOT, a table worker is defined as a person who "[e]xamines squares (tiles) of felt-based linoleum material passing along on conveyor and replaces missing and substandard tiles." *See* Dep't of Labor, D.O.T. 739.687-182, 1991 WL 680217 (G.P.O. 1991). The job description for table worker does not address the requirements of the job in terms of exposure to bright or flickering lights. (*Id.*) While Plaintiff contends that a "[c]ommon sense understanding and reading of this position would indicate this job would be performed in a factory as it is a factory assembly job," she fails to identify any evidence showing required work around bright or flickering lights. (doc. 16 at 17). Plaintiff has not met her burden to show a conflict between the DOT and VE testimony.

### 3. Use of Cane

Plaintiff argues that the ALJ failed to resolve the conflict between her need to use a cane

---

[10]*See also Zapata v. Colvin*, No. 4:13-CV-340-Y, 2014 WL 4354243, at *10 (N.D. Tex. Sept. 2, 2014) ("Courts have repeatedly found that jobs with a RDL of 2 are not necessarily inconsistent with limitations to simple instructions and routine tasks."); *Hernandez v. Berryhill*, No. EP-17-CV-25-MAT, 2018 WL 4016475, at *3 (W.D. Tex. Aug. 22, 2018) (finding "no conflict between Hernandez's RFC determination that he can 'understand, remember, and carryout simple, routine, non-detailed, non-complex work' with the RDL level two requirement"); *Swindle v. Colvin*, No. H-12-0323, 2013 WL 12106130, at *6 (S.D. Tex. Sept. 23, 2013) (finding that a plaintiff with the ability to understand simple instructions and perform simple tasks could perform jobs at a reasoning level of two); *see also Smith*, 2014 WL 1407437 at *6 (determining that a limitation to simple, repetitive, routine tasks supported work at a reasoning level of two or three); *Carter v. Commissioner*, No. 6:12-CV-265, 2013 WL 2318886 *9 (E.D. Tex. May 28, 2013) ("an occupational Reasoning Level of 2 or below is within the ambit of 'simple' type limitations").

and her ability to perform sedentary work and whether such jobs exist in significant numbers in the national economy. (doc. 16 at 17.)

SSR 96-8p offers guidelines for evaluating an individual's ability to do less than a full range of sedentary work[11] and the impact various limitations and restrictions have on the sedentary occupational base.[12] 1996 WL 374185 (S.S.A. July 2, 1996). It provides that "[a]n accurate accounting of an individual's abilities, limitations, and restrictions is necessary to determine the extent of erosion[13] of the occupational base, the types of sedentary occupations an individual might still be able to do, and whether it will be necessary to make use of a vocational resource." *Id.* at *6. The use of a "medically required hand-held assistive device" is an RFC limitation that may erode the occupational base for sedentary work in certain circumstances.

> For example, an individual who must use a hand-held assistive device to aid in walking or standing because of an impairment that affects one lower extremity (e.g., an unstable knee), or to reduce pain when walking, who is limited to sedentary work because of the impairment affecting the lower extremity, and who has no other functional limitations or restrictions may still have the ability to make an adjustment to sedentary work that exists in significant numbers. On the other hand, the occupational base for an individual who must use such a device for balance because of significant involvement of both lower extremities (e.g., because of a neurological impairment) may be significantly eroded.

---

[11]A "full range of sedentary work" is defined in part as:

[T]he ability to lift no more than 10 pounds at a time and occasionally to lift or carry articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. "Occasionally" means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday.

SSR 96-9p, 1996 WL 374185, at *3.

[12]Occupational base means "the approximate number of occupations that an individual has the RFC to perform considering all exertional and nonexertional limitations and restrictions." SSR 96-9p, 1996 WL 374185, at *7 (citing SSR 83-10, 1983 WL 31251, at *7 (S.S.A. Jan. 1, 1983)).

[13]Erosion occurs when the reduction of an individual's exertional or non-exertional capacity limits the individual to perform the full range of sedentary work, i.e., the occupational base will be "eroded" by the individual's additional limitations or restrictions. *See* SSR 96-9p, 1996 WL 374185, at *6.

*Id.* at 7. The ALJ may consult a VE to determine whether an individual who needs to use an assistive device can make an adjustment to other work that exists in significant numbers. *Id.*

Here, the ALJ complied with the guidelines of SSR 96-9p by consulting with the VE regarding Plaintiff's use of a cane and her ability to perform sedentary work. At the hearing, the VE testified that a hypothetical individual with Plaintiff's RFC could perform work as a table worker, patcher, or semiconductor bonder. (doc. 11-1 at 360.) She noted that all three sedentary jobs would be "seated at all times" with work tasks performed in a seated condition, so "using a cane to go to and from the workstation would not be a problem." (*Id.* at 361.) It is clear from the transcript that the VE considered the assisted-device limitation in determining that Plaintiff could work as a table worker, patcher, or semiconductor bonder. While the VE noted that her testimony about using a cane was not addressed in the DOT and was instead based on her job placement expertise and experience, the ALJ's decision "expressly addresses this potential conflict and expressly resolved the conflict, by accepting the VE's testimony." *Mosley v. Kijakazi*, No. 1:21-CV-107-DAS, 2022 WL 3093294, at *1 (N.D. Miss. Aug. 3, 2022).

Plaintiff argues that the ALJ failed to ask the VE whether the job numbers provided for the three sedentary jobs "would be reduced by the job's requirement to stand and or walk up to 2 hours of an 8-hour workday." (doc. 16 at 18.) This argument disregards the hearing testimony, however. As noted, the ALJ asked the VE whether the limitation that "the individual uses a cane on all different types of terrain and during all walking portions *as typically defined for sedentary work*" would impact the ability of a hypothetical person with Plaintiff's RFC to perform the three sedentary jobs. (*See* doc. 11-1 at 360-61 (emphasis added).) Because the regulations define sedentary work as being able to walk or stand for up to 2 hours of an 8-hour workday, the VE had considered this requirement when she determined that Plaintiff could still perform all three jobs.

Plaintiff also argues that the VE's testimony conflicts with the regulations because it does not address the impact of an assisted-device on the handling, fingering, and reaching requirements for all three sedentary jobs. (doc. 16 at 19). The VE stated that all work tasks were performed while seated, however, and Plaintiff has not pointed to any evidence showing that she requires the use of a cane while she is in a seated position. (*See* doc. 11-1 at 361.)

Even assuming the existence of a conflict between the DOT and the VE's testimony, such a conflict would not be direct or obvious, and would instead be an implied or indirect conflict. *See Ceballos v. Colvin*, No. EP-13-CV-381-ATB, 2015 WL 474367, at *5 (W.D. Tex. Feb. 3, 2015) (determining that plaintiff's "argument relate[d] to an implied conflict between the VE's testimony and the DOT" because nothing in the DOT's job descriptions for the jobs identified by the VE "indicate[d] that six hours of standing and/or walking [were] required to perform the job[s]"); *Zapata,* 2014 WL 4354243, at *11 (noting the difference between direct and implied conflicts with a VE's testimony). Plaintiff did not identify any conflict at the administrative hearing, and as noted, "[t]he Fifth Circuit has held that claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present the conflict as reversible error when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." *Zapata*, 2014 WL 4354243, at *11 (citing *Carey*, 230 F.3d at 142); *see also Ruffin v. Colvin*, No. 3:16-CV-18-DPJ-FKB, 2017 WL 536549, at *6 (S.D. Miss. Feb. 8, 2017) (finding that an "unexplained" conflict did not require remand because the plaintiff "failed to raise it before the hearing officer"). Remand is not required on this issue.

## IV.    RECOMMENDATION

The Commissioner's decision should be **AFFIRMED**.

**SO RECOMMENDED** on this 27th day of February, 2023.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE